## AUERBACH v. INTERNATIONALE WOLFRAM LAMPEN AKTIEN GESELLSCHAFT.

(Circuit Court, S. D. New York. March 16, 1910.)

1. ATTACHMENT (§ 102*)—CAUSE OF ACTION—AFFIDAVIT—SUFFICIENCY.

Under Code Civ. Proc. N. Y. § 636, providing that, to entitle plaintiff to a warrant of attachment, he must show by affidavit to the satisfaction of the judge that one of the causes of action specified in the preceding section exists against defendant, and, if it is an action to recover damages for breach of contract that plaintiff is entitled to recover a sum stated therein above all counterclaims known to him, it is not sufficient that plaintiff alleges a cause of action, but, in order to sustain his attachment, he must show a cause of action to the satisfaction of the judge with reasonable certainty.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 263–272; Dec. Dig. § 102.*]

2. BROKERS (§ 71*)—SERVICES—CONTRACT—CONSTRUCTION.

Where a contract for brokers' services provided that, in case of a sale of certain patent rights, plaintiff's assignor should receive a commission in case the owners utilized or called for the assignor's assistance or services at the sale or in proceedings leading up to the same, such agreement did not contemplate a payment of commissions for the owners' use of the assignor's previous services.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 56; Dec. Dig. § 71.*]

3. BROKERS (§ 10*)—EXCLUSIVE AGENCY—UNILATERAL PROMISE—REVOCATION.

A contract giving a broker an exclusive agency for a definite time for the sale of certain patent rights is but a unilateral promise, revocable by

the owner notwithstanding part performance, whether the owner commits a breach of contract in so doing or not.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 11; Dec. Dig. § 10.*]

4. ATTACHMENT (§ 105*)—AFFIDAVIT—CAUSE OF ACTION—DAMAGES.

Under Code Civ. Proc. N. Y. § 636, regulating attachment and providing that, if the action is to recover damages for breach of contract, the affidavit must show that plaintiff is entitled to recover a sum stated therein, an attachment was not authorized in a suit for alleged breach of a broker's contract of employment, in the absence of some allegations showing that plaintiff in any case would have made a sale and been entitled to compensation.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 276-279; Dec. Dig. § 105.*]

5. BROKERS (§ 13*)—EMPLOYMENT—ACTS OF PRINCIPAL.

In the absence of a provision in a broker's contract of employment giving him an exclusive agency, the principal may act independently of the broker.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 12; Dec. Dig. § 13.*]

6. BROKERS (§ 86*)—SERVICES—PROCURING CAUSE—EVIDENCE.

Facts *held* insufficient to show that a broker was the procuring cause of a transfer of certain patent rights so as to entitle the broker's assignee to recover on a quantum meruit.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116-120; Dec. Dig. § 86.*]

Action by Julius Auerbach, as assignee of J. Walter Douglass, against the Internationale Wolfram Lampen Aktien Gesellschaft. On motion to vacate an attachment. Granted.

See, also, 173 Fed. 624.

This is a motion to dissolve an attachment levied by the plaintiff upon a contract between the defendant and the General Electric Company. The defendant is a corporation organized under the laws of the kingdom of Hungary, and having its principal place of business in the city of Budapest. The plaintiff, a resident of New York, is the assignee of one J. Walter Douglass, who is, in fact, the real party in interest here, and who is referred to hereinafter as the plaintiff.

A history of the events as they are detailed in the papers is as follows: In the month of February, 1908, the plaintiff, a Philadelphia lawyer, was acting as attorney for Alexander Just and Fritz Hanaman, two Hungarian inventors, who are the predecessors in interest of the defendant company, to which they have assigned all their patent rights. At that time Just and Hanaman had patents pending in this country for certain improvements in Tungsten filament lamps. One Victor Tischler, of Vienna, was their local attorney, and on February 18th the plaintiff wrote a letter to Tischler, proposing to Just and Hanaman the sale of their patent rights in this country to the General Electric Company. It is quite clear from this letter that the plaintiff merely suggested to Tischler that the General Electric Company would be a very advantageous purchaser for them. Tischler answered on March 5th, saying that he had urged upon Just and Hanaman the proposition, and that they would entertain it, "provided you act at once," suggesting that the General Electric Company send their representative over to talk with the European parties. On April 17th the plaintiff answered that he had had a further interview with the General Electric Company, and that he had "opened broadly the way." The letter concludes as follows: "I shall now leave this whole matter to you to work out, having paved the way for the investigation you thought necessary, and quickly have I got it to the heads, for your interests, as counsel purely in the matter, unless a deal is made and then the commission between us can be arranged." On April 10th and May 4th and 5th

he wrote, suggesting that there be a combination of all the interests in the patent, which could be together sold to the General Electric Company. The General Electric Company sent over two representatives on May 20th to Europe, who called upon Just and Hanaman on July 5, 1908, but after whose report the company declined at that time further to consider the subject, owing probably to certain criminal proceedings at that time pending in America against one of the American claimants. In the fall of 1908 the plaintiff was in constant communication with Tischler, attempting to get Just and Hanaman to allow him to try to combine all the interests in the patent into an American syndicate. These interests included, not only those of Just and Hanaman, but also in Europe those of Kuzel, Von Bolten, and in this country those known as the Teeter-Heany claims. This appears from the plaintiff's letters of November 2, November 18, December 8, 1908, and also Tischler's letters of December 18, 1908, and January 5 and 15, 1909. None of these letters contains any suggestion of a contract with the General Electric Company. In the plaintiff's letter of November 18th occurs the following language: "With the General Electric Company in the field now, with its allied companies, working in this locality under it, you all are losing thousands of dollars in America daily. This could all be prevented, if the broad or basic patent were issued and proposed company control such patent." Again, on December 8th: "That would end also all the 'little fry' cropping up daily—because all their doings and patents would be dominated by the Syndicate Companies' patent rights, including the General Electric Company's acts and their allied companies' acts in Ohio and elsewhere." Tischler wrote on December 18th: "I am directed to write to you that your program is considered to be acceptable and that six months' commission, first of January, 1909, will be given to you and to you exclusively to realize your program." This referred to a "six months' option" which the plaintiff had been asking for. On January 5th Tischler writes: "None want to fight to put the proposed consolidated interests into shape for business." On January 15, 1909, Tischler writes a letter in which he incloses "suggestions for financing Just and Hanaman and Kuzel interests in U. S. A." On the 14th of January Just and Hanaman wrote a letter in German to the defendant, the important parts of which are as follows: "We intrust you for half a year, that is, until July 31st, 1909, with our representation for the purpose of negotiations towards the sale of the American Just and Hanaman patents and patent applications. * * * In case we actually conclude before July 31st, 1909, a contract in whatever form for the sale of our American patents and patent applications or of a portion of the same with a buyer brought by you you are to receive as a remuneration for your efforts and expenses a thirty per cent. commission on all cash monies, shares or benefits of whatever name. * * * If your intervention passes without results, that is, if by July 31st, 1909, no contract actually is concluded between us and a buyer brought by you, you have no claim either for a share or reimbursement for any outlay, expenses, etc. * * * The above stipulated commission is due you also in case we should dispose of the patents referred to above before July 31st, 1909, to persons not brought by you provided that we have made any claims upon your cooperation in the sale or the negotiations in any manner whatsoever." Upon receiving this letter, the plaintiff continued actively trying to procure a combination of all the interests in these patents, but on February 28th the defendant without notice to him gave an option to the General Electric Company for the sale of all its interests in the United States, and this was subsequently followed on April 15, 1909, by the conclusion of a contract which included Kuzel's interests, and under which the General Electric Company agreed to pay the defendant $250,000, of which they were to pay down $125,000 at once and $25,000 upon the 15th of April on each following year until the whole had been paid. This contract contained covenants requiring the defendant to perform various acts, such as disclosing all information relating to the patent, assigning all future inventions of a similar character, giving further assurance, refusing to enter the field in competition with the General Electric Company, and in other ways obligating itself for a term of 17 years. None of these obligations, however, were formally constituted conditions upon the General Electric Company's obligations. Upon learning of this contract and

that further negotiations looking towards a combination into a syndicate were fruitless, the plaintiff on May 21, 1909, wrote to the defendant demanding his commissions of 30 per cent. under the agreement of January 14, 1909, particularly upon the ground that the General Electric Company was a purchaser brought in by him, and that he had been prevented from carrying out his efforts of forming a combination. Failing in this, he brought an action in the Supreme Court of the state of New York on the 18th of August, 1909, by levying an attachment upon the interest of the defendant in the contract with the General Electric Company. That action was removed to this court, and on October 18, 1909, the defendant moved to vacate the attachment upon a technical ground. The attachment was vacated by Judge Ward on October 28, 1909. On October 29, 1909, the defendant assigned all its interest in the contract to a Hungarian Savings Bank by an instrument in writing which recited the consideration of $125,000, or its equivalent in Hungarian money. This instrument was properly legalized in accordance with the civil law, and there was also proof of the payment of the consideration. Hanaman, but not Just, is a director in the Savings Bank. A new attachment was levied out of this court on the 1st day of November, 1909, and it is to vacate this attachment that this order to show cause passed on January 19, 1910.

Three questions are raised under this motion: First. Whether a cause of action is stated by the plaintiff against the defendant. Second. Whether there are conditions in the chose in action which has been attached which permit it to be attached at all. Third. Whether the transfer of the chose in action to the Savings Bank is illegal and fraudulent.

Joseph M. Proskauer, for plaintiff.
Arthur C. Fraser and George C. Holton, for defendant.

HAND, District Judge (after stating the facts as above). It is the settled law of the state of New York that the plaintiff must show a cause of action to the satisfaction of the judge with reasonable certainty. Section 636 of the New York Code; Ladenburg v. Commercial Bank, 87 Hun, 269, 33 N. Y. Supp. 821. It is not enough that the complainant merely alleges a cause of action. Wallace v. Baring, 21 App. Div. 477, 48 N. Y. Supp. 692. Of the four causes of action the three first are based upon the contract of January 14, 1909, and the fourth is upon a quantum meruit. The first cause of action is based upon the plaintiff's performance of the contract, especially upon performance of the phrase:

"The above stipulated commission shall be yours * * * if we have in any manner whatsoever utilized (or made call upon) your assistance or services at the sale or in the proceeding leading up to the same."

The plaintiff does not assert that he had anything to do with the negotiations with the General Electric Company after January 14, 1909, which resulted in the contract. He asserts that he is entitled to his commissions because the defendant utilized his former assistance and services at that sale and in the proceedings leading up to the same. I do not think it necessary to determine whether the phrase "in Anspruch genommen" means "utilized" or whether it means "called upon," for I am not satisfied that it contemplated past acts of the plaintiff, or that the defendant meant to pay him if it made use of any of the work which he had hitherto done.

The second cause of action is upon the theory that he did assist in the sale because it was through him that the Kuzel interests were brought into the combination. I find no evidence in the correspond-

ence that this is true, and certainly no intimation that anything he did happened after January 14, 1909. Kuzel was in Europe and on December 8, 1909, the plaintiff writes as follows:

"What Dr. Just ought to do personally is to take up my plan of consolidation direct with the Von Bolten and Kuzel interests if it is possible to get them to consent to the plan * * * and this should be done as soon as possible."

On January 15th Tischler wrote:

"As to tactics, you will understand that Just and Hanaman have completed an agreement with Kuzel to co-operate."

It is true that prior to this, and on November 2, 1908, plaintiff had written, "I can get the Kuzel interests in line"; but it nowhere appears that he did "get him in line," or at least that he did so after January 14, 1909.

The third cause of action is for the breach by the defendant of the contract in taking up the negotiations with the General Electric Company at a time when the plaintiff had their exclusive agency. It is a vexed question whether an agency of this sort, which is fixed in time, may or may not be repudiated by the principal in the absence of an express promise by the agent to perform any services. It is, of course, obvious that, in the absence of some implied promise at the inception of the contract, it is only a unilateral promise and the principal may withdraw his offer, whenever he pleases; and it is well settled that, where the contract is not for a fixed time, he may do so. Rees v. Pellow, 97 Fed. 167, 38 C. C. A. 94; Sibbald v. Iron Co., 83 N. Y. 378, 38 Am. Rep. 441. When the contract is for a given time, the authorities differ. In Milligan v. Owen, 123 Iowa, 285, 98 N. W. 792, where the agency was not exclusive, it was held it might be revoked, and so it was held in Green v. Cole, 103 Mo. 70, 15 S. W. 317, provided no work had been done under it. In Bathrick v. Coffin, 13 App. Div. 101, 43 N. Y. Supp. 313, the broker had expended large sums of money in the sale of the land, but it does not appear whether the contract originally contemplated this or not. In several of the cases the matter is confused with the revocation of a power of attorney, coupled with an interest, a totally different subject. The power of the agent is certainly revocable whether the principal commits a breach of contract in so doing or not. In principle I am very clear that the agent makes no implied undertaking, and that the promise is unilateral. It is an error to suppose that the subsequent part performance of the conditions of a unilateral promise create an obligation. Either it is given at the outset for a counterpromise or it is given for the performance of the acts specified. Although the results are often unjust, they should not pervert the rectitude of such fundamental principles of law as those controlling the creation of contract obligations.

However, I am not satisfied in any event that the plaintiff has shown any damages, if there was a breach. It is necessary to prove substantial damages under the section in question, the terms of which are:

"If the action is to recover damages for a breach of contract the affidavit must show that the plaintiff is entitled to recover a sum stated therein."

In the absence of some allegations from which it would appear that the plaintiff would have in any case made the sale, there is no evidence of damages. His letters indicate that all negotiations with the General Electric Company were assumed to be off, nor can I say that his negotiations elsewhere would have been successful.

I have assumed that the contract with Just and Hanaman created an exclusive agency between the defendant and the plaintiff, and the ground for this is contained in Tischler's letter to him of December 18, 1908, in which he says:

"I am directed to say to you that your program is considered to be acceptable and that six months' commission, first of January, 1909, will be given to you and to you exclusively to realize your program."

However, the letter of January 14th does not in terms give the plaintiff an exclusive right, and I do not wish to say that the two are necessarily to be read together or to construe the contract as giving him an exclusive right. I am simply giving the plaintiff the benefit of this doubt, because it is well settled that without such a provision the principal could act independently. Faulkner v. Cornell, 80 App. Div. 161, 80 N. Y. Supp. 526; McClave v. Paine, 49 N. Y. 562, 10 Am. Rep. 431; Chilton v. Butler, 1 E. D. Smith, 150.

The fourth cause of action is upon a quantum meruit. This depends upon the theory that it was through the plaintiff's efforts that the contract was obtained. It is well settled that a broker's services consist in procuring the purchaser, and that, unless he does induce in him a state of mind through which he is ready and willing to make the contract, he has failed. Probably the plaintiff procured the trip to Europe of the two representatives of the General Electric Company, and, had the contract been consummated at that time, he would possibly have earned his commissions, whatever they were worth. That question would depend upon his original employment by the defendant for that purpose, a question not wholly clear in the papers. If he was a volunteer, and had not been employed, he could not recover. In the view I take of the other facts, it is not necessary to determine whether or not he was ever employed as broker before January 14, 1909.

From the correspondence in the fall and winter of 1908, it appears that the parties supposed the negotiations with the General Electric Company were over, and that they were negotiating for combination of all the interests into an independent syndicate, which would, when formed, either compel the General Electric Company to come to terms, or stop its infringements. I certainly am not satisfied that the subsequent negotiations and completion of the contract between February 28 and April 15, 1909, were in any sense a continuation of the original negotiations of the summer, or procured by the plaintiff, and I am fortified in this conclusion, in that his chief reliance is the contract of January 14, 1909.

Of course, when the plaintiff comes to present his case in a tribunal which has jurisdiction of the defendant, it may well be that he can succeed in clearing up any of the difficulties which I have suggested, but where, as here, it is necessary that he should satisfy the judge in

advance that he has a cause of action, I can only say that he has failed to do so, and that that jurisdictional requisite under the Code does not exist. It is unnecessary to consider the other two points which have been raised.

I must therefore grant the motion, and vacate the attachment.